John A. HEALEY, Plaintiff–Appellant,

Michael S. Press, Appellant,

v.

CHELSEA RESOURCES, LTD., Defendant,

Dominick & Dominick Securities, Inc. and Dominick & Dominick, Incorporated, Defendants–Appellees.

Nos. 1414, 1415, 1455, Dockets 90–9026, 91–7056, 91–7058.

United States Court of Appeals, Second Circuit.

Argued April 22, 1991.

Decided Oct. 18, 1991.

Robert J. Jossen, New York City (Richard D. Owens, Shereff, Friedman, Hoffman & Goodman, on the brief), for plaintiff-appellant Healey.

Jay Topkis, New York City (Gerard E. Harper, Gidon M. Caine, Paul, Weiss, Rifkind, Wharton & Garrison, on the brief), for appellant Press.

Richard J. Wiener, New York City (Gregory M. Petrick, Cadwalader, Wickersham & Taft, on the brief), for defendants-appellees Dominick & Dominick Securities, Inc. and Dominick & Dominick, Inc.

Before NEWMAN and KEARSE, Circuit Judges, and STANTON, District Judge.*

KEARSE, Circuit Judge:

Plaintiff John A. Healey appeals from judgments entered in the United States District Court for the Southern District of New York following a bench trial before Robert L. Carter, *Judge*, (1) dismissing his claims against defendants Dominick & Dominick Securities, Inc. ("Dominick" or "Dominick Canada") and its parent, Dominick & Dominick, Inc. ("Dominick U.S.") (collectively the "Dominick Companies"), under § 12(2) of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. § 77*l* (2) (1988), § 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b) (1988), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.-10b–5 (1990), and common law, and (2) imposing sanctions against him in favor of the Dominick Companies pursuant to Fed. R.Civ.P. 11 and § 11(e) of the 1933 Act, 15 U.S.C. § 77k(e), in the amount of $222,-714.07. Pursuant to the same sanctions provisions, the district court held Michael S. Press, Healey's trial counsel, jointly liable with Healey for payment of $122,744.25 of the sanctions award. On appeal, Healey contends principally that the district court (1) made findings of fact that were clearly erroneous, (2) made rulings that improperly prejudiced his ability to prove his case, and (3) followed improper procedures and applied incorrect standards in imposing sanctions. Press also challenges the procedures preceding the imposition of sanctions and contends as well that the imposition of sanctions against him (a) under § 11(e) was improper as a matter of law, and (b) under Rule 11 was an abuse of discretion. For the reasons below, we affirm the dismissal of the complaint; we vacate the award of sanctions against Healey and remand for

---

* Honorable Louis L. Stanton, Judge of the United States District Court for the Southern District of New York, sitting by designation.

further proceedings on that issue; and we reverse the award of sanctions against Press.

## I. BACKGROUND

At the times pertinent to this litigation, Healey was a professional investor with a substantial background in precious metals. Defendant Chelsea Resources, Ltd. ("Chelsea"), a newly formed Canadian corporation in 1987, was the owner and developer of the Spotted Horse gold mine ("Mine") in Montana. Once a flourishing operation reportedly producing high-grade gold ore, the Mine had remained largely inactive since the late nineteenth century. In August 1987, Chelsea retained Dominick, a broker-dealer, to arrange a private placement of Chelsea securities.

In September 1987, Dominick contacted Healey in an effort to interest him in purchasing the Chelsea securities. Dominick's vice president Anthony Field sent Healey a packet including an offering summary that indicated that funds raised through the placement would be used "[t]o repay loans to Newfields Minerals Inc. and related parties," a July 1987 research report by Dominick's former vice chairman Robert C. Wong ("Wong Report"), Chelsea's 1986 Annual Report containing audited financial statements for the year ending October 31, 1986 and the three months ending January 31, 1987, and press releases and status reports on the Mine. As set forth in somewhat greater detail in Part II.A. below, Healey thereafter received other reports, projections, and Chelsea financial documents; and he made inquiries, met with members of Chelsea's management, including Brian McAlister, its president and chief operating officer, and sought independent advice. In mid-October 1987, Healey dissuaded Chelsea from accepting an offer from a company called City Resources for the investment of some $9 million; Healey invested more than 1.5 million Canadian dollars ("CN$") in Chelsea, undertook to arrange for other financing for Chelsea, and became a member of Chelsea's board of directors.

Chelsea's effort to redevelop the Mine proved ill-fated. In February 1988, Healey sold some of his Chelsea securities at a loss, and the rest eventually became worthless. He resigned from the Chelsea board in May 1988, and in September 1988 brought the present action principally under the 1933 Act and 1934 Act, alleging that Chelsea and the Dominick Companies had misrepresented to him both the true financial condition of Chelsea and the purposes for which the proceeds of the private placement would be used.

### A. The Ruling on the Merits

Healey's claims were tried in a four-day bench trial at which Chelsea, by then reportedly defunct, did not appear. Following the trial, the remaining parties submitted posttrial memoranda, and in conjunction with their memorandum the Dominick Companies moved under § 11(e) of the 1933 Act and Fed.R.Civ.P. 11 for an award of sanctions against both Healey and his trial attorney Press. Healey's attorneys urged the court to defer its decision on the sanctions motion until after its decision on the merits; the Dominick Companies suggested that there might be a conflict of interest between Healey and Press on the matter of sanctions. The district court refused to postpone consideration of sanctions.

In an Opinion dated August 31, 1990 ("August Opinion"), reported at 132 F.R.D. 346, the district court dismissed the complaint on the ground that Healey had failed to prove misrepresentations, scienter, or reliance. It found Healey's claims frivolous and, as discussed in greater detail in Parts I.B. and III below, granted the Dominick Companies' motion for sanctions against both Healey and Press. As to the merits of Healey's claims against Dominick U.S. in particular, the court found that Healey had "presented not one scintilla of evidence" to establish liability on the part of that defendant. August Opinion, 132 F.R.D. at 351. As to Healey's claims against all of the defendants, the court stated, in part, as follows:

This case never should have been brought. There was more than a failure

of proof at trial to establish any of the claims made. The proof clearly showed that Healey had no basis for making his claims and that he must have known that he instituted bogus litigation. Healey involved himself in this transaction eagerly, with full knowledge of the risks. Although receiving a word of caution from his own expert, he did not pause or hesitate in his quest for the gold just over the horizon, confident that his own superior resources, knowledge and expertise would gain him the prize he sought.

There were no misrepresentations made to Healey by either Dominick & Dominick or Chelsea, and even if it is assumed for the sake of argument that such misrepresentations were established, there clearly was no reliance. Healey spoke to Field on September 11, 1987, concerning Chelsea and the Spotted Horse mine.... In this initial conversation Field avoided "hard sell" tactics. He told Healey that he had not made any independent verification of the technical and financial data in regard to Chelsea. Healey brushed this disclaimer aside assuring Field that he had the appropriate experience and skill to appraise such data on his own.

....

.... Although [William] Trebilcock, Healey's own expert, was not convinced that the project would succeed, Healey was not deterred.

....

At the September 18, 1987 meeting ... Healey was given full and complete information on Chelsea's financial condition, the status of all litigation in which it was involved and the financial burden which the project faced in bringing the physical structures to the level so that the mine could be worked profitably. On October 6, 1987, Healey succeeded in preventing Chelsea from agreeing to take a huge and much needed infusion of financing from City Resources. McAlister was strongly in favor of accepting the City Resources proposal and, in seeking at that critical October 6th meeting in Toronto to convince Healey to agree with him, he emphasized the huge costs Chelsea faced in bringing the mine physically up to legal and operational standards.... Even if the fact finder had not been certain that Healey had received full and complete information about the probable costs in insuring the viability of the project before October 6, 1987, the only conclusion that can be reached from learning of the October 6, 1987 meeting and its contents was that Healey at least at that point was given all the facts.

There was no misrepresentation or failure to state a material fact by either Dominick or Chelsea to Healey.... In addition, to succeed on the § 10(b) and Rule 10b–5 claim, there must be a showing of scienter on the part of defendants, ... or such recklessness as to amount to scienter.... There was no proof as to any defendant to meet this standard.

August Opinion, 132 F.R.D. at 350–51.

## B. *The Rulings on Sanctions*

In its August Opinion, the court also ruled that the Dominick Companies were entitled to sanctions against Healey and Press, stating that "Healey's testimony at trial was totally lacking in credibility, and I am personally convinced that he brought this action in bad faith with the deliberate intent to blackmail the Dominick defendants into paying him off." August Opinion, 132 F.R.D. at 353. The court alluded to McAlister's trial testimony that in December 1987 Healey had "stated ... that he was considering suing Dominick & Dominick, and ... that Dominick & Dominick wouldn't want their good name smeared and would be most likely willing to settle." (Trial Transcript ("Tr.") 436.) The court, noting that Healey did not directly deny making this statement but merely stated he did "not recall" having made it, characterized posttrial efforts by Healey and Press to explain the statement as a "fabricated explanation" and "an obvious contrivance." August Opinion, 132 F.R.D. at 353.

As to the role of Press, the court stated:

It is altogether clear that this case is frivolous. It is also conceivable, and indeed likely, that plaintiff was not forth-

coming with counsel initially and that counsel entered the case with the good faith belief that it had substance and merit. However, once the evidence was in, it is difficult for me to understand how counsel could possibly have persisted. There was no evidence whatsoever of the involvement of Dominick U.S. That awareness should have resulted in a dismissal of that claim at least on the eve of trial. It was also manifest early on that plaintiff placed reliance on his own resources in this case.... If that was not enough, the fact that Healey as a member of the Chelsea board of directors voted on December 9, 1987, to retain Dominick Canada and Field for another private placement effort should have made it crystal clear to counsel that he should not proceed with this case further. With all of those indices of spuriousness and with counsel pressing on, I must conclude that Press continued to act as counsel in this case with full knowledge that it had no merit.

*Id.* The court instructed defendants to submit affidavits substantiating their fees and expenses and authorized Healey to file opposition papers.

In the wake of the court's August Opinion, Press retained counsel and Healey retained new counsel, and both moved for reargument of the decision on sanctions. Healey argued that he was entitled to reconsideration because the motion for sanctions had engendered a conflict of interest between himself and Press. Press moved for enlargement of the record and argued that § 11(e) of the 1933 Act does not authorize the imposition of sanctions against an attorney and that Rule 11 was not applicable to him in the circumstances.

In an Opinion dated December 10, 1990 ("December Opinion"), reported at 133 F.R.D. 449, the district court denied the motions of Healey and Press and rejected their arguments against imposition of sanctions. As to Healey, the court reiterated the view stated in its August Opinion that there was no conflict of interest between Healey and Press and stating that even had there been one,

[a]ny conflict of interest could not have prejudiced Healey because it is clear from the facts apparent at trial and from the court's own observation of Healey's testimony, independent of the arguments of counsel, that the case was frivolous and that Healey brought the action in bad faith.

*December Opinion,* 133 F.R.D. at 453. The court also rejected Press's contentions that § 11(e) and Rule 11 were not applicable to Press in the circumstances of the present case.

After considering the submissions as to the amount of the Dominick Companies' fees and expenses, the court awarded sanctions in the total amount of $222,714.07. It held Healey liable for the entire amount; it held Press jointly liable with Healey to the extent of $122,744.25.

### C. The Appeals

Healey appeals from the judgments entered in the district court to the extent that they dismissed his complaint against the Dominick Companies and imposed sanctions against him. Press appeals from the judgments to the extent that they imposed sanctions against him.

## II. THE MERITS

In challenging the dismissal of his complaint, Healey contends principally (1) that the district court's findings as to misrepresentation, scienter, and reliance were clearly erroneous, and (2) that he was unfairly prevented from testifying about crucial events and introducing relevant documentary evidence. Under the controlling principles of review, we find no basis for reversal of the dismissal.

### A. The Findings

In order to prove his claims under § 12(2) of the 1933 Act and § 10(b) of the 1934 Act, Healey was required to prove by a preponderance of the evidence, *inter alia,* that defendants misrepresented or omitted a material fact in connection with his purchase of Chelsea securities and that he had no knowledge of the untruth or omission. *See, e.g., Mayer v. Oil Field*

*Systems Corp.*, 803 F.2d 749, 755 (2d Cir. 1986). With regard to his claims under § 10(b) and Rule 10b–5, Healey was also required to prove defendants' scienter, *see, e.g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976), or such recklessness as to amount to scienter, *see, e.g., Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 575 (2d Cir.), *cert. denied*, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982), and he was required to prove as well that the alleged misrepresentations were a "substantial factor" in or a "significant contributing cause" of his investment decision, *see, e.g., Herzfeld v. Laventhol, Krekstein, Horwath & Horwath*, 540 F.2d 27, 33–34 (2d Cir.1976).

■■■ Matters of misrepresentation, knowledge, reliance, causation, and scienter are questions of fact, and the trial court's findings as to those facts may not be set aside unless they are clearly erroneous, *see* Fed.R.Civ.P. 52(a). Assessment of the credibility of witnesses is peculiarly within the province of the trier of fact and is entitled to considerable deference, *Anderson v. Bessemer City*, 470 U.S. 564, 573–75, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985), and "when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error," *id.* at 575, 105 S.Ct. at 1512. Further, where the evidence would support either of competing inferences, the fact that this Court might have drawn one inference does not entitle it to overturn the trial court's choice of the other. *Id.* at 574, 105 S.Ct. at 1511 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."); *United States v. Yellow Cab Co.*, 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949).

■■ In the present case, the gist of Healey's complaint was that defendants had misled him principally by understating the amount of capital Chelsea needed to satisfy its payables and to bring its ore processing equipment up to speed. The evidence at trial, including the following, was sufficient to support the district court's findings that Healey failed to prove misrepresentations and reliance. Dominick's vice president Field first contacted Healey concerning Chelsea on September 11, 1987. Between that initial contact and Healey's delivery of his certified check for CN$1.625 million on October 13, Healey had communications with numerous individuals with respect to the needs and prospects of Chelsea. Most of his communications were with officials of Chelsea itself. He had no contacts whatever on the subject with Dominick U.S.

Healey's receipt of information on the subject from Dominick Canada was limited to the period September 11 to 14. During that period, Field gave him press releases, projections as to ore grade and potential earnings, the Wong Report, noncurrent Chelsea financial information for periods ending more than six months earlier, and a summary of the private placement offering indicating that funds raised through the placement would be used to repay certain loans. But Field told Healey that he did not have Chelsea's current financial information and that he had not independently verified such technical and financial data as he had. The financial statements provided by Field revealed, among other negative financial indicators, that Chelsea had a negative net worth as of January 31, 1987. The Wong Report, which indicated that it had relied to an extent on a report prepared for Chelsea by Dr. Neil Westoll, an independent consultant, stated that it believed its sources were reliable, but it expressly declined to represent that the information supplied was "accurate or complete." The projections as to ore grade and earnings, prepared by Field himself, were less optimistic than those in the Wong Report. Healey knew Field was not a geologist and told Field that he, Healey, knew Westoll and had sufficient experience and skill to appraise the data independently. Healey spoke with Westoll at length about the Westoll report. Healey also sought information from his friend William Trebilcock,

an independent securities analyst. Trebilcock raised questions about the project, including why the Mine had been abandoned if its prospects were so rosy.

Healey proceeded to have numerous preinvestment contacts with Chelsea, principally with its chairman Fernando Nuflo–Moya, its president and chief operating officer McAlister, and its solicitor Michael Scholz, during which Healey held himself out as an experienced investor capable of independently evaluating the information given him. At an October 6, 1987 meeting with McAlister, Westoll, and Nuflo–Moya, McAlister detailed to Healey the City Resources proposal to invest $9 million in Chelsea to help satisfy Chelsea's additional capital needs, describing those needs. On the basis of this record, the court concluded that at least a week prior to the investment, Healey had obtained the information he alleged was concealed from him. Healey urged Chelsea not to accept the City Resources proposal, informing McAlister and Nuflo–Moya that Healey would not invest if the proposal were accepted and promising to secure alternative financing for Chelsea if it were rejected. To this end, in the next few days Healey arranged for a $2 million line of credit for Chelsea, and Chelsea thereafter did not further pursue the City Resources offer. Though Healey testified that it was represented to him that the $9 million offered by City Resources was to be used to fund new exploration, McAlister testified to the contrary. McAlister stated that at the October 6 meeting he reviewed for Healey all of the work remaining to be completed at the Mine, including the need to complete its winterization and the need for a new shaft, tailings pond, and hoist; that he told Healey that Chelsea lacked the wherewithal to fund these projects; and that he told Healey the City Resources $9 million was to be used to help satisfy Chelsea's additional capital needs. It was within the prerogative of the district court to credit the testimony of McAlister and to disbelieve that of Healey.

Healey, understandably, emphasizes evidence that provides support for his contention that there were misrepresentations on which he relied. For example, the Wong Report, though carefully hedged, was generally rosy; the Chelsea financial statements, though presenting a negative current picture, were not inconsistent with a brighter future; and Nuflo–Moya testified that he could not recall whether he had informed Healey that Chelsea did not have adequate resources to undertake full-scale operation. Healey testified that in fact he was not informed of Chelsea's true financial picture.

The fact that there was evidence in the record to support Healey's view of the events, however, did not and does not require judgment in his favor. The decision as to whose testimony to credit and as to which of competing inferences to draw was within the province of the district court as trier of fact. That court was unpersuaded that there had been any misrepresentations by Dominick Canada or any reliance, reasonable or otherwise, by Healey. In light of the evidence that Field's statements were hedged, that even the key report given Healey by Field, *i.e.*, the Wong Report, was itself hedged, that Healey proclaimed his own expertise to Field and Chelsea, and that Healey was given complete information by Chelsea as to its financial needs prior to making his investment, we cannot say that the court's findings are clearly erroneous.

### B. *The Evidentiary Rulings*

Healey's challenges to several of the trial court's evidentiary rulings do not lead to a different result. These rulings principally curtailed Healey's testimony as to (1) reliance, (2) his September 14 conversation with Field, and (3) October 6 statements of McAlister as to the latter's reasons for advocating the City Resources proposal. The court also excluded certain documents that Healey sought to introduce in evidence. Though some of these rulings are troubling, they do not require reversal.

 The trial court has broad discretion over the admission of evidence. Its evaluation of relevance is entitled to substantial deference, *see, e.g., George v. Celo-*

*tex Corp.*, 914 F.2d 26, 28 (2d Cir.1990) ("district court's determination of relevance will not be disturbed unless it evidences an abuse of discretion"), and even proof that is relevant may permissibly be curtailed to avoid the "needless presentation of cumulative evidence," Fed.R.Evid. 403. Evidentiary rulings ordinarily will not be overturned absent an abuse of discretion, *see, e.g., United States v. Torres*, 901 F.2d 205, 234 (2d Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *In re Martin–Trigona*, 760 F.2d 1334, 1344 (2d Cir.1985) (evidentiary rulings generally not to be disturbed unless " 'manifestly erroneous,' " quoting *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962)), and even an erroneous ruling will not lead to reversal unless affirmance would be "inconsistent with substantial justice," Fed.R.Civ.P. 61.

■ Healey's strongest challenge is to the court's curtailment of his testimony on the issue of reliance. During his direct examination, Healey was asked, "what, if anything, did you rely on in making your investment in Chelsea?" and, "In making your investment, did you rely on anything at all?" (Tr. 197.) The court sustained defense objections to these questions, stating, "The objection is sustained. I am not prepared to allow him to make what are essentially self-serving statements. He can't do that." (*Id.*) To the extent that this was a ruling that a party generally is not allowed to give testimony that is self-serving, it was erroneous. Certainly in the context of a securities fraud claim in which reliance must be proved, the plaintiff should be allowed to identify the statements on which he claims to have placed reliance. The fact that such testimony may be self-serving goes to its weight rather than its admissibility. *See, e.g., United States v. Lawal*, 736 F.2d 5, 8 (2d Cir.1984); *United States v. DiMaria*, 727 F.2d 265, 271 (2d Cir.1984).

We find no reversible error here, however. First, we do not understand the court to have meant to preclude testimony as to reliance, for in sustaining an objection to the leading form of an earlier question,

the court stated, "Obviously, you have a right to find out from Mr. Healey what if any, of these matters he relied upon...." (Tr. 141.) In fact, Healey did indicate what he relied on in making his investment, testifying at various points on both direct and cross-examination as to statements that were made to him and information he was given, and stating or implying that these were factors in his decision to invest in Chelsea. To the extent that Healey had so indicated prior to the court's refusal to allow him to answer the above questions, the court's ruling may have been intended simply to prevent a cumulative summary. Thus viewed, the ruling was not an abuse of discretion. To the extent that Healey had not so testified theretofore but did indicate his reliance thereafter, the court's ruling, though error, was harmless. In any event, since the question of reliance would have been material only if there had been sufficient proof of a material misrepresentation · or omission, and the court found that "[t]here was no misrepresentation or failure to state a material fact by either Dominick or Chelsea to Healey," 132 F.R.D. at 351, any improper curtailment of Healey's ability to testify to reliance was harmless.

■ The court does appear to have erred in foreclosing testimony by Healey as to his September 14 meeting with Field. Healey had testified that Field gave him projections showing Chelsea producing gold worth $2.1 million over the next 4½ months. When Healey was asked on direct examination to describe the substance of his conversation with Field on that occasion, he responded simply, "Mr. Field gave me an update with projections that he prepared." The court then cut off further questioning about the September 14 meeting as cumulative, believing that the matter had been fully explored in Healey's testimony the day before:

Q. Can you give us, sir, the substance of the conversation that you had with Mr. Field at the Toronto airport?

A. Mr. Field gave me an update with projections that he prepared.

THE COURT: We have been through much of this yesterday. I don't think you recall, apparently, but we have been through it.

MR. PRESS: I don't understand that to be the case. If we have, I will be happy to move on.

Q. Let me show you, sir—your Honor, I understood that the witness had testified about a telephone conversation.

THE COURT: A telephone conversation, they met at the airport and he called them up, he got a report from Mr. Wong and also some statistics that he himself had prepared. That was all testified to yesterday.

MR. PRESS: We will be very brief on the subject.

THE COURT: As a matter of fact, when he said about the statistics prepared by Mr. Field, you asked the question about that with some surprise. That is as I recall it. In any event, ... you have made ... inquiry of Mr. Healey that he has not left out anything from the meeting.

(Tr. 160–61.) Healey challenges this ruling as error, pointing out that his prior testimony had dealt only with his telephone conversations with Field, not the September 14 face-to-face meeting. Though our reading of the trial transcript indicates that the prior day's testimony describing the September 14 meeting was that of Field, and that Healey had testified only to other conversations, we find no basis for reversal. The court's conflation of the two testimonies should have been clear to Healey's attorney, who indeed immediately stated that he did not understand Healey to have testified on the subject. It was incumbent on him to clarify the matter for the court either at that point or during the remaining days of trial, when the error could easily be corrected, rather than waiting to claim reversible error on appeal.

Healey's challenge to the court's curtailment of his testimony as to statements by McAlister at the October 6 meeting is meritless. In responding to a question as to what Healey had been told at that meeting as to Chelsea's financial needs, Healey stated that he had been informed that the City Resources funds were needed to finance exploration of another property near the Mine. The court then observed that the subject of the proposed investment by City Resources had been "exhausted," and Healey responded that he "was through with City [Resources]." (Tr. 194.) We see in the court's ruling no error, much less reversible error.

■■■ Finally, the exclusion of certain documents proffered by Healey provides no basis for reversal. Most of the exhibits of whose exclusion Healey complains were documents relating to events after Healey's October 13 delivery of his certified check in payment for the Chelsea securities. As to documents relating to postpurchase events, it was well within the discretion of the trial court to conclude that they had so little relevance to the questions of prepurchase representations and reliance that they should be excluded. Other proffered exhibits designed to show that Dominick U.S. was a "controlling person" of Dominick Canada within the meaning of § 15 of the 1933 Act, 15 U.S.C. § 77o, and § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), and hence derivatively liable for derelictions of the latter, should perhaps have been admitted. But since we uphold the court's findings that Healey failed to establish the liability of Dominick Canada, the exclusion of documents designed to establish Dominick U.S.'s derivative liability was at most harmless error.

## III. SANCTIONS

The district court imposed sanctions under Fed.R.Civ.P. 11 and § 11(e) of the 1933 Act. Healey and Press challenge both the application of these provisions and the procedures followed by the district court. For the reasons below, we conclude that the procedures followed were inappropriate, that § 11(e) did not authorize an award of sanctions against Press, and that the award of sanctions against Press under either that section or Rule 11 was an abuse of discretion.

## A. The Imposition of Sanctions Against Healey

### 1. The Substance of the Decision

■ Section 11(e) of the 1933 Act allows the district court, in its discretion, to award sanctions against a plaintiff if the court finds the claims under that Act to have been "without merit." We have interpreted the term "without merit" as used in that section to authorize sanctions only if the court has found that the claim at issue was brought in bad faith or at best bordered on the frivolous. *See, e.g., Aid Auto Stores, Inc. v. Cannon,* 525 F.2d 468, 471 (2d Cir.1975); *Klein v. Shields & Co.,* 470 F.2d 1344, 1347 (2d Cir.1972); *Katz v. Amos Treat & Co.,* 411 F.2d 1046, 1056 (2d Cir.1969). In considering these questions, the court may consider, *inter alia,* the sophistication of the plaintiff as an investor. *See, e.g., Zissu v. Bear, Stearns & Co.,* 805 F.2d 75, 80 (2d Cir.1986) ("[a]s a sophisticated investor, [plaintiff] should have known enough not to consider projections to be representations about the future and not to rely on materials outside" a private offering memorandum), *aff'g* 627 F.Supp. 687, 694 (S.D.N.Y.1986) (awarding sanctions on claims deemed "utterly without merit").

■ Rule 11 of the Federal Rules of Civil Procedure provides, in pertinent part as follows:

> The signature of an attorney or party [on a pleading, motion, or other paper of a party] constitutes a certificate by the signer ... that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose.... If a pleading, motion, or other paper is signed in violation of this rule, the court ... shall impose upon the person who signed it, a represented party, or both, an appropriate sanction....

The court is to impose sanctions against a party and/or his attorney under Rule 11 when it appears that a pleading or other signed paper has been interposed for an improper purpose or that after reasonable inquiry, a competent attorney could not form a reasonable belief that the signed paper was well grounded in fact. *See, e.g., Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 254 (2d Cir.1985) ("*Eastway I*"), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). In determining whether sanctions have been properly awarded under Rule 11, we are to apply an abuse-of-discretion standard to "all aspects" of the district court's determination. *Cooter & Gell v. Hartmarx Corp.,* — U.S. ——, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.*

■ With respect to the imposition of sanctions against Healey, there is no indication that the court misapplied the law, and we cannot say that the court made any clearly erroneous findings on the basis of the record before it. Healey's case rested, in large part, on his own testimony. The court was not required to believe that testimony but was free to reject it as incredible. Further, the court's finding that Healey's claims were "bogus," August Opinion, 132 F.R.D. at 350, and that Healey had a "bad faith ... deliberate intent to blackmail the Dominick defendants into paying him off," *id.* at 353, were supported by, *inter alia,* the trial testimony that prior to commencing the suit, Healey told McAlister that he was considering suing Dominick in anticipation that it would settle in order to avoid having its "good name smeared," (Tr. 436).

### 2. The Procedure Followed

We are concerned, however, that Healey was not given a proper opportunity to oppose the motion for sanctions and to augment the record with appropriate countervailing evidence. The court, over Healey's objection, chose to decide the motion for sanctions simultaneously with the merits, and it refused to allow any reargument by Healey or Press thereafter. We conclude

that use of this procedure was an abuse of discretion in the present case.

A potential for conflict is inherent in a sanctions motion that is directed against both a client and a lawyer, even when, as here, the two agree that an action was fully warranted in fact and law. *See, e.g., In re Ruben,* 825 F.2d 977, 985 (6th Cir.1987), *cert. denied,* 485 U.S. 934, 108 S.Ct. 1108, 99 L.Ed.2d 269 (1988). A sanctions motion attacking the factual basis for the suit will almost inevitably put the two in conflict, placing in question the attorney's right to rely on his client's representations and the client's right to rely on his lawyer's advice.

A court that concludes, in deciding the merits, that a particular claim clearly lacked merit, will likely have formed some view as to whether sanctions may be warranted. Though there is thus perhaps some small measure of efficiency to be gained in combining consideration of sanctions with consideration of the merits, we conclude that the interest in efficiency is not sufficiently compelling in the context of a claim that turns on the plaintiff's credibility. In such a case it is highly disadvantageous to the plaintiff for both sets of arguments to be pressed simultaneously, for it can only reduce a plaintiff's chances of prevailing on the merits if simultaneously with asking the court to believe his testimony and thereby find his claim meritorious he must urge that his claim is "at least not frivolous." Similarly, it must lessen the plaintiff's chances to prevail on the merits if his counsel, in an effort to escape sanctions against himself, must concurrently point out that plaintiff's trial testimony was not as extensive as his deposition testimony or was otherwise less forceful than counsel had reason to believe it would be. We think it unduly prejudicial to require a plaintiff, either himself or through his trial attorney, or through new and independent counsel, to point out while the court is considering the merits, that plaintiff's trial testimony is less persuasive than it was expected to be.

Combining consideration of the merits with consideration of sanctions against the trial attorney also poses untenable alternatives for the attorney, for to protect himself counsel may, as suggested above, be forced to point up relative weaknesses in his client's trial evidence. Here, for example, Press points out that Healey's trial testimony may have been less persuasive than Press expected because Healey's mention of certain documents at trial in response to nonleading questions was fairly casual, whereas at his deposition Healey had been far more explicit and detailed in describing these documents in terms of defendants' misrepresentations and omissions and his own reliance on them. Though there appears to have been nothing inherently untrustworthy about Healey's testimony, Press was thus placed in an unreasonable personal position, for an attorney who withdraws from representing a client during trial risks violating his ethical responsibility to his client, *see, e.g., Stitt v. Williams,* 919 F.2d 516, 528 (9th Cir.1990); and an attorney who continues to represent a client despite the inherent conflict of interest in his so doing also risks an ethical violation, *see, e.g., Calloway v. Marvel Entertainment Group,* 854 F.2d 1452, 1471 (2d Cir.1988), *rev'd on other grounds,* 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989).

While we do not mean to imply that the issue of sanctions may never be decided simultaneously with a decision on the merits, we conclude that especially where, as here, the critical question is the claimant's credibility, it is inappropriate to require that the parties argue jointly the question of sanctions and the merits. Accordingly, though the record as it stands would support the court's imposition of sanctions against Healey, we vacate that award and remand for further proceedings in which Healey may have the opportunity to augment the record and fully present his position.

**B.** *The Imposition of Sanctions Against Press*

As to the imposition of sanctions against Press, if the only defect were the procedural flaw discussed above, we would remand

for further consideration of the award against him. However, since we do not interpret § 11(e) to authorize sanctions against a party's attorney, and since we conclude that the award against Press under either that section or Rule 11 was an abuse of discretion, we reverse outright the imposition of sanctions against Press.

### 1. *Sanctions under § 11(e) of the 1933 Act*

■ Section 11(e) of the 1933 Act provides that where a judgment is "rendered against a party litigant" on a suit under that Act, "the court may, in its discretion, ... upon the motion of the other party litigant," award the latter

> the costs of such suit, including reasonable attorney's fees ... if the court believes the suit or the defense to have been without merit, in an amount sufficient to reimburse him for the reasonable expenses incurred by him, in connection with such suit, such costs to be taxed in the manner usually provided for taxing of costs.

15 U.S.C. § 77k(e). The section was designed to provide a deterrent against "blackmail suits" and against baseless defenses to meritorious claims. *See* 78 Cong. Rec. 8669 (May 12, 1934) (explanatory memorandum of Senator Fletcher, sponsor of proposed § 11(e)). Though some district courts have imposed sanctions against attorneys under § 11(e), reasoning that an attorney experienced in securities matters should share with the client the responsibility for fees incurred in defending a suit "which never should have been brought," *Rubin v. Long Island Lighting Co.*, 576 F.Supp. 608, 616 & n. 12 (E.D.N.Y.1984); *see Wielgos v. Commonwealth Edison Co.*, 123 F.R.D. 299, 306 (N.D.Ill.1988), and though the impact of § 11(e) in deterring frivolous claims and defenses would be increased by holding counsel vulnerable to such an award, several factors persuade us that § 11(e) was not intended to authorize an award against the parties' attorneys.

■ First, the section does not state that such an award may be made against the attorneys. It states only that it may be made against a "party litigant." Thus, § 11(e) stands in contrast to other sections and Rules that expressly provide for the imposition of sanctions against attorneys, *see, e.g.,* 28 U.S.C. § 1927 (authorizing sanctions against "[a]ny attorney" who unreasonably and vexatiously multiplies the proceedings); Fed.R.Civ.P. 11 (permitting sanctions against "attorney" who has signed a pleading, motion, or other paper); Fed.R.Civ.P. 37(a)(4) (for abuse of discovery process, authorizing court to award sanctions against "the party or attorney ... or both"). When a fee-shifting statute that authorizes the courts to award attorneys' fees to prevailing parties does not mention an award against the losing party's attorney, the appropriate inference is that an award against attorneys is not authorized. *See Roadway Express, Inc. v. Piper,* 447 U.S. 752, 761, 100 S.Ct. 2455, 2461, 65 L.Ed.2d 488 (1980) (inferring that 42 U.S.C. §§ 1988 and 2000e–5(k) were not intended to permit recovery of costs or fees from opposing counsel since neither section "makes any mention of attorney liability"); *Eastway Construction Corp. v. City of New York,* 821 F.2d 121, 123–24 (2d Cir. 1987) ("*Eastway II*") (order that part of fee award be paid by plaintiffs' attorneys was authorized only by Fed.R.Civ.P. 11, not § 1988, because the latter "makes no provision for imposing upon plaintiff's counsel the burden of fees awarded to a prevailing defendant").

■ Further, § 11(e) provides that the sanctions awarded be included as "costs" of the litigation and provides that these costs are to be taxed in the usual manner. In general, absent some express provision such as that found in 28 U.S.C. § 1927, costs are assessed against parties, not against their attorneys. *See generally* 10 C. Wright & A. Miller, *Federal Practice and Procedure* § 2665 *et seq.* (2d ed. 1983 & 1991 Supp.).

Finally, the legislative history of § 11(e), though scant, seems to indicate that Congress did not intend to authorize sanctions against the attorneys but only against the parties. As described in a congressional memorandum, the proposed § 11(e) was de-

signed to serve as, *inter alia,* "a defense against blackmail suits as well as a defense against purely contentious litigation on the part of the defendant," and would permit the court to "assess costs *against either the plaintiff or the defendant,* where the court is convinced either that the plaintiff's suit had no merit or that the defendant's defense had no merit." 78 Cong.Rec. 8669 (May 12, 1934) (emphasis added). Even a bare reference in the legislative history of a fee-shifting provision to " 'an award of attorneys' fees against a *party'* ... reinforces the view that the statute was not intended to permit recovery from opposing counsel." *Roadway Express, Inc. v. Piper,* 447 U.S. at 761 n. 9, 100 S.Ct. at 2461 n. 9 (quoting S.Rep. No. 94–1011, at 5 (1976) accompanying proposed § 1988 (emphasis in *Roadway* )). Given the care taken in the congressional discussion of the proposed § 11(e) to explain an already clear denotation, *i.e.,* that by "party litigant" the section meant "either the plaintiff or the defendant," we are loath to infer that "party litigant" was silently understood to encompass as well an entirely different class, the parties' attorneys.

Accordingly, we conclude that the award of sanctions against Press under § 11(e) of the 1933 Act must be reversed.

### 2. *Sanctions under Rule 11*

Rule 11 requires that, when a party is represented by an attorney, every pleading, motion, or other paper be signed by at least one attorney of record in the attorney's individual name. As noted in Part III.A. above, such a signature constitutes a representation that "to the best of the signer's knowledge, information, and belief," the statements in the pleading, motion, or paper are, *inter alia,* "well grounded in fact." Fed.R.Civ.P. 11. Press argues that the award of sanctions against him under this provision should be set aside because (1) he signed no paper to which Rule 11 could have applied, and (2) in any event, the award of sanctions was not premised on his signing any paper to which the Rule applies. We agree with his second argument and note that the first may have merit as well.

■ Press's first argument is based in part on the fact that barely a month prior to trial, the court denied a motion by the Dominick Companies for summary judgment dismissing the complaint against them. The court ruled, on the basis of the record then before it, that there were genuine issues of fact to be tried as to, *inter alia,* Dominick's representations to Healey regarding Chelsea, Dominick's knowledge of the state of completion of the Mine, and Chelsea's intended use of the private placement funds. *See* 736 F.Supp. 488, 492–94 (1990). Thus, Press argues that papers submitted prior to that ruling could not properly be the subject of Rule 11 sanctions since the court ruled that the record was sufficient to warrant a trial. *See Oliveri v. Thompson,* 803 F.2d 1265, 1274 (2d Cir.1986) (under Rule 11, signer's conduct must be assessed "as of the time the pleading or other paper is signed"), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). So far as the record reveals, the only court papers signed by Press thereafter were Healey's posttrial memorandum and Press's own declaration in opposition to the motion for sanctions. The latter plainly could not form the basis for the award of sanctions if there were no earlier paper to which the Rule could have applied.

Nor can we conclude that the posttrial memorandum was a document on which Rule 11 sanctions could be based, for Healey's claims were rejected after trial on the basis of the court's assessment of Healey's credibility—a matter solely within the province of the finder of fact. Press was not required in the posttrial memorandum to withdraw Healey's claims merely because Healey's trial testimony was less forceful than his deposition testimony. As we have intimated above, Healey's trial testimony was not incredible as a matter of law; had the court made findings of misrepresentation and reliance in Healey's favor, we would not have overturned those findings as clearly erroneous.

■ In any event, the court did not base its award of sanctions on Press's filing of court papers in bad faith. Rather,

the bases stated in the August Opinion for imposing sanctions against Press were (1) the lack of evidence of the involvement of Dominick U.S., and (2) the court's finding that Healey's trial testimony was entirely incredible. Neither basis was appropriate. Though the court stated that the first of these factors should have led to the dismissal of Healey's claims "on the eve of trial," we note that Healey attempted at trial to introduce documents designed to show that Dominick U.S. was a controlling person liable for the acts of Dominick Canada. Since Dominick U.S. was Dominick Canada's parent, the possibility of Dominick U.S.'s controlling-person liability in the event Healey prevailed against Dominick Canada was hardly fanciful; indeed, Press might have understood the court's prior denial of Dominick U.S.'s summary judgment motion on the controlling-person issue, as to which the court stated that "the plaintiff [is required to] allege and prove control, leaving it to the defendant to plead and prove good faith and lack of participation," 736 F.Supp. at 495, as a ruling that proof of a parent-wholly-owned-subsidiary relationship would suffice. Whether or not sufficient, such proof would at least seem relevant, and Press was not required to anticipate on the eve of trial either that Healey would be unsuccessful on his claims against Dominick Canada or that the court would exclude the proffered documents intended to show that Dominick U.S. was a controlling person.

■ The principal basis for the court's award of sanctions, its finding that Healey's trial testimony was "totally lacking in credibility," was not an appropriate basis for an award of sanctions against Press as Healey's attorney under either § 11(e) or Rule 11. Rule 11 targets situations " 'where it is patently clear that a claim has absolutely no chance of success.' " *Stern v. Leucadia National Corp.*, 844 F.2d 997, 1005 (2d Cir.) (quoting *Eastway I*, 762 F.2d at 254), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988); *cf. Aid Auto Stores, Inc. v. Cannon*, 525 F.2d at 471 (to warrant imposition of sanctions under § 11(e), claim must be or border on the frivolous, or be brought in bad faith);

*Klein v. Shields & Co.*, 470 F.2d at 1347 (same); *Katz v. Amos Treat & Co.*, 411 F.2d at 1056 (same). In determining whether or not a claim was totally unfounded, the "[c]ourts must strive to avoid the wisdom of hindsight in determining whether a pleading was valid when signed, and any and all doubts must be resolved in favor of the signer." *Eastway I*, 762 F.2d at 254.

The district court's denial of the Dominick Companies' pretrial motion for summary judgment, stating, *inter alia*, that Healey's deposition testimony revealed the existence of genuine issues of material fact to be tried, meant at least that that deposition testimony was not incredible as a matter of law. That the court proceeded to find Healey's trial testimony incredible as a matter of fact was insufficient to support the court's conclusion that, on the eve of trial, Press should have withdrawn as Healey's counsel if Healey would not withdraw his claim. While we do not mean to imply that an attorney automatically gains immunity from Rule 11 sanctions whenever he has successfully fended off a motion for summary judgment, we cannot, in light of the pretrial record here, uphold the district court's ruling that counsel should have known Healey's trial testimony would be deemed so incredible that his claims would be found frivolous.

In sum, we conclude that, while the court's assessment of Healey's credibility and his motive for bringing the action may provide a basis for an award of sanctions against Healey, it did not in the present case provide an appropriate basis for an award against his attorney, and the latter award was a misapplication of Rule 11 and § 11(e) principles.

## CONCLUSION

We have considered all of the arguments presented on these appeals. We affirm so much of the judgment as dismissed the complaint; we reverse the award of sanctions against Press; and we vacate the award of sanctions against Healey and re-

mand for further proceedings on the motion for sanctions against him.

Press shall recover his costs on appeal from the Dominick Companies; the other parties shall bear their own costs of these appeals.